UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:18-CR-44-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| LUIS EDUARDO SALTO-GARCIA, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*

Defendant Luis Salto-Garcia, who faces immigration and firearms charges, DE #1, filed a motion to suppress. DE #14 (Motion). The United States opposed. DE #18 (Response). Defendant replied. DE #19 (Reply). The Court held an evidentiary hearing on June 14, 2018, where it heard the sworn testimony of three witnesses and admitted certain video exhibits. The matter is ripe for consideration. For the following reasons, the Court **DENIES** DE #14.

I.  **FACTUAL BACKGROUND AND THE TESTIMONY**[1]

In the early morning hours of March 1, 2018, reports of possible domestic violence and a woman refusing to leave property drew law enforcement to Hilaur Farm in northern Fayette County. At the hearing, Lexington Police Department Sergeant Benjamin Stratton, farm resident and employee Charles Casey, and farm co-owner Lauren Hester described the night's events.

---

[1] The digital record captured the hearing, and the Court bases its analysis on facts it finds premised on that record, to include the tendered video.

1

Casey, who lives and works at Hilaur, was a cotenant in the same residence as Defendant Salto-Garcia. The residence, designed to house three workers (at the time of these events, Casey, Salto, and a Mr. Bustamonte) as part of their employment, is located on farm property. Each tenant had a private bedroom, but otherwise shared the residence's common areas, including a kitchen, dining area, living room, and hallway. On the night at issue, Casey testified that he "woke up to a girl screaming," which he said had happened "a few times before." This time, however, he "got up to see what it was" and found "a girl and Luis [Defendant] arguing" in Spanish near the door to Salto's bedroom. Casey attempted to instruct the woman to leave the residence because she did not live there, and he began to move her belongings outside. The woman eventually exited the residence, but, per Casey, refused to leave the farm property. At that point, around 3:00 a.m., Casey decided to involve Hester, who lives in a separate home on the farm. Hester soon joined the scene and called the police. She thought the alleged victim had dialed 911 as well.

After arriving at the Russell Cave Road farm,[2] officers encountered a fluid and evolving situation. They soon identified and spoke with the alleged victim, who stated, according to Stratton, that she "was going through a breakup" with her boyfriend, Defendant Salto. She asserted, conversing through a Spanish-speaking officer, that Salto had "grabbed her hair and pulled it" and "possibly struck her in the side of the face." Stratton testified that the victim also alleged that Salto "had a firearm," which, per the Sergeant, Defendant denied. When Stratton told Hester this information, she advised that

---

[2] Stratton described some initial confusion over the precise farm location. Police preliminarily responded to an incorrect address. Hester located the officers and personally accompanied them to the correct site, granting them access through the electronic entrance gate onto farm property.

she did not permit firearms on the property. Lexington PD was, thus, in the midst of a dynamic scenario involving allegations of domestic violence and physical abuse. Officers were "not sure if there was a firearm or not just because we were getting conflicting stories." Through dispatch, Stratton also learned that a firearm was "possibly . . . hidden in a wheel well of a vehicle at one point, but that possibly it had been moved." Uncertainty attended the night's events. The specter of an unaccounted-for gun, potentially located near a possibly violent suspect, loomed.

LDP dispatch identified Bustamonte as one of the reporting callers. Police, desiring to continue the investigation of the reported domestic violence and, specifically, speak with Bustamonte, asked Casey for consent to enter the residence's common areas. Casey (and Stratton) testified that he (Casey) voluntarily so consented. Casey told officers "they could go inside and look around." He described the request: "They asked if they could go inside, and I said yes." Casey, in fact, as the video shows, literally opened the door for officers to enter and personally accompanied officers into the home. Further, Hester, a co-owner of the property, who has a key and full access to (at least) the common areas of the residence,[3] independently told police that "if they felt they needed to go into the house, they could." She directly testified that she, as a co-owner, "gave consent to the[] officers to enter into the common areas of th[e] structure." Law enforcement, as the testimony and video revealed, never entered the private bedrooms.

Based on the joint consent of Casey and Hester, law enforcement entered the residence and located Bustamonte. As officers were walking toward the door to exit and

---

[3] Hester said that "every once in a while" she would, in fact, enter the common areas of the residence to inspect general cleanliness. She testified that she had the right, at any time, to enter the structure's common areas, without warning the tenants. Again, the residence is one Hilaur provides to three residing employees as part of their remuneration.

3

interview Bustamonte outside, Stratton testified, and the body camera video confirms, that one officer noticed a firearm, obviously in plain sight, resting on a cushion of the couch in the common living room of the modestly sized home. Lexington PD seized the weapon, and further events unfolded with Salto, leading to the current Indictment. Counts 2 & 3 evidently involve the firearm.

## II. ANALYSIS

### A. *Legal Principles*

The Fourth Amendment generally prohibits unreasonable searches and seizures. This case implicates well-developed consent and plain view doctrines.

"Entrance by the police into a home—which constitutes a search for Fourth Amendment purposes—is permissible only where justified by a warrant, exigent circumstances, or valid consent." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016). The Sixth Circuit has explained:

> Consent may lawfully permit the police to enter even if it is not given by the occupant whose Fourth Amendment rights are at issue. A third party with a "sufficient relationship to the premises" may consent in the absence of the occupant in question. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (holding that a warrantless search of a bedroom with the consent of a person cohabiting with the defendant and claiming to be his wife did not violate defendant's Fourth Amendment rights). A third party's "common authority" "rests [] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7, 94 S. Ct. 988; *cf. Illinois v. Rodriguez*, 497 U.S. 177, 181-82, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (finding no common authority where a person sometimes spent the night at the apartment but never went there when the primary occupant was not at home).

*Id.* at 709-10. Further, the

4

> [G]overnment bears the burden of proving through "clear and positive testimony" that consent to enter was given voluntarily. *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (internal quotation marks omitted). The [G]overnment's showing must satisfy the preponderance standard. *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999). Consent is voluntary if it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." [*United States v.*] *Moon*, 513 F.3d [527,] 537 [(6th Cir. 2008)] (internal quotation marks omitted). The [G]overnment is required to show something more than "mere acquiescence[.]" *United States v. Canipe*, 569 F.3d 597, 603 (6th Cir. 2009). The inquiry is . . . objective.

*United States v. Holland*, 522 F. App'x 265, 273-74 (6th Cir. 2013) (emphasizing that the inquiry probes the "totality of the circumstances").

As to the pistol seizure, the

> law recognizes the plain view doctrine as an exception to the warrant requirement. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Four factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object.

*United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (one citation removed); *see also Horton v. California*, 110 S. Ct. 2301, 2306 (1990); *United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002) (similar 4-part test, characterizing prong 3 as officers "see[ing] something that immediately appears to be evidence"). Prong 3 "does not require that officers *know* that evidence is contraband." *Id.* at 441 (emphasis in original). Instead, probable cause remains the touchstone. *Id.*; *United States v. Beal*, 810 F.2d 574, 576-77 (6th Cir. 1987).

*B.     Warrantless Entry*

Law enforcement, in this scenario, plainly had valid consent, via two persons with relevant authority (cotenant and owner), to enter and search the common areas of the farm workers' residence without a warrant. Indeed, Defendant conceded the point at the close of the hearing. Nevertheless, the Court, for thoroughness, also evaluates the issues.

*First*—A "third party who possesse[s] common authority over . . . the premises . . . sought to be inspected" may validly permit police to enter and search those premises. *Matlock*, 94 S. Ct. at 993; *Smith*, 821 F.3d at 709-10; *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011) (stating that "a co-occupant who shares common authority over the premises" may validly consent to search). That happened here. Casey, one of Salto's cotenants in the shared residence, validly consented, under the applicable standard, to law enforcement entering and searching the structure's common areas. Casey directly testified that he voluntarily and intelligently gave such consent; indeed, facing utterly no coercion, he freely opened the door for police to enter and accompanied them inside. He confirmed that neither duress nor undue pressure tainted the interaction. Casey's testimony was unquestionably the "clear and positive" proof *Beauchamp* requires, and his consent validated the entry and search of the shared common areas of the residence. Again, the search did not extend to any tenant's private bedroom.

*Second*—Even if "a landlord does not generally possess authority to grant consent to the search of a tenant's private living quarters," a landlord nevertheless "obviously may enter and control h[er] building's common spaces and may thus consent to a search of such spaces." *United States v. Kimber*, 395 F. App'x 237, 244 n.8 (6th Cir. 2010). That, too, happened here. Hester, a co-owner of the residence, and the (as described

under oath at the hearing) landlord of the building, directly testified that she freely and intelligently consented to law enforcement entering and searching the common areas of the structure. That, as with Casey, undoubtedly amounts to the "clear and positive testimony" required and, thus, under the applicable standard, independently validates the police's conduct. Hester has a key to the building and full, direct access to the common areas; she actually, at times, exercises her right as owner of the residence to enter, without warning, to inspect for cleanliness and compliance with her rules. She, as did Casey, validly consented to law enforcement entering and searching the building's common areas. Police, thus, based on both individuals' valid consent, did not contravene the Fourth Amendment by entering and searching the common areas of the relevant residence without a warrant.

C.     *Pistol Seizure*

Seizure of the firearm raises different concerns and calls for a particularized analysis. The Court concludes, for the following reasons, that the plain view doctrine legitimizes the seizure.[4]

As the Court described previously, "[f]our factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *Garcia*, 496 F.3d at 508.

The Court can address factors 1 and 2 with dispatch. Each is satisfied. First, the gun was obviously in plain view, as Stratton testified and the video showed. An officer shined his flashlight on the couch in the living room (a common area), and a gun resting

---
[4] Accordingly, there is no need to analyze the "protective sweep" basis for seizure.

7

on one of the cushions, next to a hat, was obviously apparent and in plain sight. "The fact that the officer used a flashlight is immaterial." *United States v. Weatherspoon*, 82 F.3d 697, 699 (6th Cir. 1996). Second, as the Court held in Section II.B, the officer was legally present in the place where he viewed the gun.

The third factor presents thornier issues, but the Court concludes that law enforcement, on these facts, had probable cause to believe the gun's evidentiary value and incriminating nature were immediately apparent. Consider what Lexington PD knew (and did not know) when the view and seizure occurred. A group of officers had responded, in the pitch black, around 3:00 a.m., to an isolated, rural farm to reports of suspected domestic violence and a female, who could only speak Spanish, refusing to leave property where she did not live. The possible victim described her ongoing "breakup" with Salto and reported grabbing and pulling of hair and a possible violent facial strike by Defendant. The officers also immediately began to hear chatter of an unaccounted-for firearm. The victim directly told law enforcement that Defendant "had a firearm." Salto, per Stratton, denied such possession, but dispatch also radioed that there was "possibly" a firearm "hidden in a wheel well of a vehicle at one point, but that possibly it had been moved." Police likewise knew that firearm possession violated Hester's rules governing the property. Stratton described the pointed ambiguity under which the Lexington PD was operating—that, in an evolving situation, in an isolated environment, involving allegations of abusive and violent behavior, officers were "not sure if there was a firearm or not just because we were getting conflicting stories." The eventual seizure occurred in this fluid, developing, potentially dangerous context.

The relevant factors to consider in the prong 3 inquiry "include 1) a nexus between the seized object and the items particularized in the search warrant, 2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity, and 3) whether the . . . officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *McLevain*, 310 F.3d at 441 (internal quotation marks removed). "[N]one of these factors is necessary[; instead,] they are instructive[.]" *Id.*

The first factor, textually, does not fit well in the absence of a search warrant. Analogizing, however, the Court sees a plain nexus between the gun and the potential crime(s) the police were at the residence investigating. *See United States v. Gray*, 484 F.2d 352, 355 (6th Cir. 1973) (in a case also arising "in rural Fayette County," phrasing the first factor more broadly, examining the "nexus between the rifles and the crimes of" investigation); *McLevain*, 310 F.3d at 441 (more generally exploring the "nexus between the object seized" and "the subject of the search"). Remember, law enforcement was probing potential domestic abuse, and the alleged victim, in this context, had specifically tagged her boyfriend with firearm possession. A firearm—a deadly weapon—could be used as a tool, and could be evidence, of violence. A nexus between the seized object and the crime(s) of investigation existed.

While the "intrinsic nature" of a firearm does not automatically give rise to probable cause of criminality, *see McLevain*, 310 F.3d at 441 (stating the second prong would apply to situations "such as" police finding "marijuana or cocaine on at table"),[5]

---

[5] Clearly, as a general matter, seeing a firearm in plain view is different from seeing, *e.g.*, a baggie of cocaine; the latter is intrinsically incriminating, while the former is not necessarily so, in every circumstance. *See, e.g., Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132-33 (6th Cir. 2015).

the third factor, in the domestic violence context and on these facts, does pertain. The officers could, at the time of firearm discovery, and on the facts then available to them, determine there was probable cause of the pistol's incriminating nature and evidentiary value. *See United States v. Holmes*, 36 F. Supp. 3d 970, 977 (D. Mont. 2014) ("An item's incriminating character is not determined solely by the item in isolation, but in the context of the surrounding circumstances."). Probable cause is a common-sense, "fluid," "practical," and "nontechnical" analysis that looks (through an objective prism) to the totality of the circumstances known to law enforcement at the time. *Maryland v. Pringle*, 124 S. Ct. 795, 799-800 (2003); *Illinois v. Gates*, 103 S. Ct. 2317, 2331-33 (1983); *McLevain*, 310 F.3d at 441 (describing probable cause as "a flexible, common-sense standard . . . merely requir[ing] that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . . or useful as evidence of a crime" (internal quotation marks omitted)).

As the Court has described, there was much uncertainty in the unfolding events at Hilaur, but there was undoubtedly probable cause to believe that the gun was associated with criminality. The facts available to the officer at the moment of viewing the gun would warrant a person of reasonable caution in the belief—*i.e.*, there was a reasonable basis to believe—that the pistol may be evidence of a crime—*e.g.*, assault, battery, or other domestic abuse. The purported victim, again, alleged specific acts of violence by Salto and particularly flagged Salto's alleged firearm possession, and there were independent reports of a firearm, previously concealed in a vehicle's wheel well, possibly secreted away. Law enforcement knew specific allegations of domestic abuse and

violence and explicit reports of a present, but still missing, firearm. When such a gun turned up in Salto's residence, there was a reasonable basis to connect it with criminality.

The Court thus concludes, on review of the totality, that there was probable cause to believe the gun was associated with criminal activity and had evidentiary value. *See, e.g.*, *United States v. Schmidt*, 700 F.3d 934, 939 (7th Cir. 2012) (in plain view gun seizure context, contemplating that "officers may have probable cause to seize an ordinarily innocuous object when the context of an investigation," as well as "the context of the crimes" at issue, "cast[] that item in a suspicious light" (internal alteration removed)) (citing cases); *United States v. Simmons*, 861 F. Supp. 2d 307, 310-11 (S.D.N.Y. 2012) ("The incriminating nature of a gun is immediately apparent."); *United States v. Graziano*, 558 F. Supp. 2d 304, 311-12 (E.D.N.Y. 2008) (holding "that the police officers were allowed to seize . . . weapons prior to determining whether they were illegally possessed" and finding "probable cause to believe that these other weapons in plain view were associated with criminal activity") (citing cases); *United States v. Guarente*, 810 F. Supp. 350, 353 (D. Me. 1993) (approving plain view rifle seizure when Defendant "had used the rifle to menace Kenney"); *see also United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007) ("[E]ven if a loaded handgun is legally possessed, because of its inherently dangerous nature, police may seize it if there are articulable facts demonstrating that it poses a danger.").[6]

---

[6] For completeness, the Court mentions, without extensively exploring, an alternative theory concerning gun seizure in like scenarios centered on an officer's ability to secure loose firearms at the scene of an active investigation. *See, e.g.*, *United States v. Bishop*, 338 F.3d 623, 627-28 (6th Cir. 2003) ("[F]or the seizure of a gun in plain view (and which is not obvious contraband) to be reasonable under the Fourth Amendment, a police officer must reasonably believe, based on specific and articulable facts, that the weapon posed an immediate danger to officer or public safety."). Surely, such a theory would apply here, given all the factors discussed, including, at the time of seizure, the ongoing

The Court thus determines, on these facts, and upon full consideration of the factors (none of which in isolation is determinative) that the gun's "incriminating nature [was] immediately apparent" and that officers saw "something that immediately appear[ed] to be evidence." Accordingly, the Court finds satisfaction of prong 3.

Finally, the officer had a right of access to the gun. The "requirement of a lawful right of access means that generally an officer should get a warrant if possible before he seizes an item in plain view." *McLevain*, 310 F.3d at 443. Defendant did not specifically contest satisfaction of this prong in the briefing or at the hearing. For many of the same reasons discussed above—including, *e.g.*, the fluid, dynamic, evolving situation, the domestic violence veneer, and the conflicting information concerning firearm presence— the Court concludes that the circumstances of the investigation and seizure gave law enforcement here a lawful right of access to the gun. Unlike in *McLevain*, police could not guarantee that the gun, sitting openly in a common living room, would "not go[] anywhere," and no one, at the time of pistol seizure, "was in custody." *See id.* The circumstances here, in the Court's assessment, justified the immediate seizure and a declination to first "take[ the] evidence of probable cause to a magistrate." *Id.*; *see also Atchley*, 474 F.3d at 850. It would have been, here, "a needless inconvenience"—and, indeed, perhaps a deadly one—"to require the police to obtain [a] warrant." *Gray*, 484 F.2d at 356. The Court concludes that, in view of all the circumstances, police validly had a right of access to the firearm.

---

investigation of reported domestic violence, the fact that a female, semi-hysterical, had refused to leave private property in the wee hours, the conflicting reports of and confusion over firearm presence, the fact that no person (including Salto, a potentially violent man, based on the possible victim's direct reports) was yet in custody, and the generally fluid nature of the totality. Police could reasonably believe, based on these specific factors, that the pistol posed an immediate danger to officer or public safety.

For these reasons, the Court finds satisfied the four prongs of the plain view doctrine and that law enforcement validly executed a plain view seizure of the subject firearm. No basis for suppression exists.

### III. CONCLUSION

Accordingly, the Court **DENIES** DE #14.

This the 21st day of June, 2018.

Signed By:
*Robert E. Wier*  REW
United States District Judge